UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHELLE FERGUSON,

    Plaintiff,

    v.

LOCAL 689, AMALGAMATED
TRANSIT UNION, et al.,

    Defendants

Civil Action No. 08-1030 (JDB)

MEMORANDUM OPINION

Plaintiff Michelle Ferguson brings this action against defendants Local 689, Amalgamated Transit Union, and three of its employees, sued in their official capacities only (together "Local 689"). Ferguson, an employee of Washington Metropolitan Area Transit Authority ("WMATA"), was discharged from her position as a bus driver after her bus hit and killed a pedestrian. She alleges that WMATA discharged her without sufficient cause, in violation of its collective bargaining agreement with Local 689. She further alleges that Local 689 breached its duty of fair representation under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, by handling the grievance proceedings following her discharge in an arbitrary and perfunctory manner. Ferguson also asserts a claim against Local 689 for intentional infliction of emotional distress ("IIED"). On June 19, 2009, this Court granted WMATA's motion to dismiss and permitted Ferguson to pursue her claims against Local 689. See Ferguson v. Local 689, Amalgamated Transit Union, 626 F. Supp. 2d. 55 (D.D.C. 2009). Currently before the Court are cross-motions for summary judgment from Ferguson and Local

1

689. For the following reasons, this Court will grant Local 689's motion for summary judgment.

## BACKGROUND

WMATA employed Ferguson as a bus driver from September 6, 2002 until her discharge on June 29, 2006. Am. Compl. ¶¶ 6, 10. During that time, Ferguson was covered by the terms of the collective bargaining agreement between WMATA and Local 689. Id. ¶ 7. On June 8, 2006, Ferguson's bus hit a pedestrian, who later died from injuries sustained in the collision. Id. ¶ 9. WMATA discharged Ferguson after determining that the accident was "major" and "preventable" under WMATA's Accident Policy, and that the accident resulted from her gross negligence, reckless conduct, and disregard for the basic principles of bus safety. Id. ¶¶ 10-11. Prior to June 8, 2006, Ferguson had not been involved in any accidents while performing her duties as a bus operator at WMATA. Plaintiff's Statement of Material Facts Which Are Undisputed ("Pl.'s Statement") [Docket Entry 36-2] ¶ 3. Ferguson contends that WMATA's investigation of the accident was not thorough and the allegations against her were "false and groundless and wholly without evidentiary support." Am. Compl. ¶ 11. She further contends that Local 689's actions were "discriminatory, in bad faith, arbitrary and capricious" and that Local 689 frustrated her attempts to appeal her discharge by instituting only a "perfunctory defense" on her behalf. Id. ¶ 21.

Accident Investigation

On June 8, 2006, as Ferguson's bus made a right turn off of Jenifer Street onto Wisconsin Avenue, the bus struck a pedestrian "who had walked into the crosswalk crossing Wisconsin Avenue." Pl.'s Statement ¶ 11. WMATA Assistant Superintendent Robert L. Ballard investigated the accident. See Accident Report Form, Plaintiff's Deposition Exhibit 4 ("Accident

Rpt.") [Docket Entry 60-15]. Ballard interviewed Ferguson and Metropolitan Police Officers Connor and Belton, who witnessed the accident. Id. Ballard's attempts to contact other witnesses to the accident were not successful. Id. Officer Connor reported that Ferguson "was turning right, watching a male pedestrian on the left side walking towards the bus" when the "female pedestrian began to walk into the crosswalk." Id. at 2. The female pedestrian, according to Officer Conner, "was in the operator's blind spot" when the bus hit her. Id. The Accident Report Form contains a number of questions, to which the WMATA investigator must check "yes" or "no." Id. at 1. Ballard's responses to these questions indicate that he did not visit the scene of the accident (although he was thoroughly familiar with it), that he did not inspect the equipment involved, that a brake test was not performed, and that a traffic citation was not issued. Id. "Based on . . . the Operator's report, the Street Supervisor's report and The Guide to Determining Preventable Accidents," Ballard concluded that the accident was "major" and "preventable," that Ferguson had committed "multiple violations of Standard Operating Procedures," and accordingly he dismissed Ferguson effective June 29, 2006. Id.

Separately, the Metropolitan Police Department also prepared an investigative report on the accident to determine whether to pursue criminal charges against Ferguson. See Metropolitan Police Department Report, January 1, 2007, Plaintiff's Deposition Exhibit 11 ("Police Rpt.") [Docket Entry 60-16]. Detective Michael Miller performed a "crash reconstruction," which involved witness statements, pictures of the crash scene, and a study of the traffic light timing sequence, among other components of the accident scene. Id. Miller also interviewed Officer Connor, who again stated that Ferguson "was looking in the direction of the [male] pedestrian who was walking westbound in the crosswalk," and also provided the additional details for the

3

police report: that the female pedestrian "was 5 to 7 feet inside the crosswalk" and "using her hands in the air, saying 'hey, hey'" when she was hit by the bus. Id. at 2. The Police Report's final recommendations state that Ferguson "most likely did not see the pedestrian prior to impact" and that the pedestrian "entered the crosswalk during the 'don't walk' stage of the light timing sequence." Police Rpt. at 5. Miller recommended against proceeding with criminal charges against Ferguson. Id. An initial Police Report was available in September 2006, and a final, supplemental report was completed on January 1, 2007. Id.; Deposition of Michelle Ferguson, July 8, 2009 ("Ferguson Dep.") [Docket Entry 60-14] 165:5-14. Ferguson provided the initial report from Detective Miller to Local 689 in September 2006. Ferguson Dep. 165:5-14.

Grievance Proceedings

Immediately after her termination, Ferguson sought assistance from Local 689 to contest her discharge. Ferguson Dep. 120:8-10. Ferguson met with the shop steward, Michael Myrick, and then with union officer Wayne Garland. Id. 128:6-12. The union representatives informed her about the grievance procedure and the additional option to appeal the classification of her accident as "major" and "preventable" to the accident review board. Id. 125:12-24; 126:1-21. WMATA's Accident Policy, which was negotiated by WMATA and Local 689, permits an employee to "appeal the accident rating [] to a review board composed of an Assistant General Superintendent, a Union Business Agent, and a Police Officer" and provides that "[a]ll results from a majority of the review board will be binding." BUSV Disciplinary Policy for Preventable Accidents ("Accident Policy") [Docket Entry 60-4] at 81.

On July 6, 2006, Ferguson submitted her accident appeal to the accident review board.

4

Ferguson Dep. 129: 7-13; Accident Appeal Form, Plaintiff's Deposition Exhibit 6 ("Accident Appeal") [Docket Entry 60-15]. The accident appeal hearing occurred the next day. Ferguson Dep. 129: 7-13; see also Accident Appeal. At the hearing, Myrick and Ferguson presented Ferguson's case, spending "about an hour" reenacting the accident and explaining Ferguson's perspective as to what had happened. Ferguson Dep. 132:16-24; 133:1-12. The accident review board denied Ferguson's appeal that day. See Accident Appeal.

On July 10, 2006, Ferguson spoke with union representative Garland and filed a grievance asserting that the punishment of discharge was "too harsh." Ferguson Dep. 128:6-24; 129:1-6; Grievance of Michelle Ferguson, Plaintiff's Deposition Exhibit 5 ("Ferguson Grievance") [Docket Entry 60-15]. WMATA subsequently denied Ferguson's grievance at each of the four required administrative steps of the grievance process. Id.; see Am. Compl. ¶ 16. At Step 4, Garland met with Jerome Artis from WMATA. Defendant's Revised Statement of Undisputed Facts ("Def.'s Statement") [Docket Entry 60-2] ¶ 8. On behalf of WMATA's General Manager, Artis denied Ferguson's grievance on October 5, 2006. Id. The CBA allowed 60 days to send written notice to WMATA if Local 689 desired to appeal the General Manager's decision to arbitration. Id. On October 20, 2006, Local 689's Executive Board voted not to pursue Ferguson's grievance because Board members believed it could not be won in arbitration. Id. ¶ 9. At union meetings that took place on November 6 and 7, 2006, the union membership voted to overturn the Executive Board's decision and to have the union present Ferguson's case before the Arbitration Board. Id. ¶ 10. Local 689 conducted triennial union-wide elections for union officers in December 2006, which resulted in a change of leadership at the union, including the officials responsible for pursuing Ferguson's grievance. Id. ¶ 12, 13.

5

On February 9, 2007, long after the 60-day window within which to file an arbitration request had lapsed, Local 689 requested arbitration of Ferguson's grievance. Id. ¶¶ 18-19. On November 6, 2007, the Board of Arbitration declined to hear the merits of Ferguson's grievance because Local 689 had filed the request in an untimely manner. Id. ¶ 20. The arbitration decision stated that the determination of the accident review board that the accident was "major" and "preventable" was binding. Michelle Ferguson Arbitration Decision, Plaintiff's Deposition Exhibit 8 ("Ferguson Arbitration")[Docket Entry 60-16] at 2. However, the Arbitration Chair also indicated that he was "not persuaded at [that] point that the binding nature of the decision extends to the degree of discipline imposed on Ms. Ferguson." Id.

## **LEGAL STANDARD**

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(2); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine dispute of material fact sufficient to

preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## ANALYSIS

**I.     Count I -- Section 301/Fair Representation Claim**

A "hybrid" action under § 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C.A. § 185, is one in which a union member sues his or her employer for breach of its contractual obligations under a collective bargaining agreement and also sues the union for breach of its duty of fair representation. An employee may bring a hybrid section 301 claim against the employer, the union, or both, but regardless of who he sues, "the case he must prove is the same." DelCostello v. Int'l Broth. of Teamsters, 462 U.S. 151, 165 (1983). In a hybrid action, the employee must show that (1) the union breached its duty of fair representation ("DFR") and (2) the employer breached the collective bargaining agreement ("CBA"). Id. at 164-65; Cephas v. MVM, Inc., 520 F.3d 480, 485 (D.C. Cir. 2008). The employee may only prevail upon proving both causes of action. Hines v. Anchor Motor Freight, 424 U.S. 554, 570-71 (1976).

1. Union's Duty of Fair Representation

The union has an obligation "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca v. Sipes, 386 U.S. 171, 177 (1967). A union breaches its duty of fair representation "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Id. at 197. Thus, "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion." Id. at 191. However, "[m]ere negligence is insufficient to establish that the union acted arbitrarily." Noble v. USPS, 537 F. Supp. 2d. 210, 216 (D.D.C. 2008); Watkins v. Commc'ns Workers of Am., 736 F. Supp. 1156, 1161 (D.D.C. 1990). "In considering DFR complaints that are premised on assertions of arbitrary action, the courts and the Board accord deference to a union, finding a DFR breach only if the union's action 'can be fairly characterized as so far outside a "wide range of reasonableness"' that it is entirely irrational." Thomas v. N.L.R.B., 213 F.3d. 651, 656 (D.C. Cir. 2000) (quoting Air Line Pilots Ass'n Int'l v. O'Neill, 499 U.S. 65, 78 (1991)).

Ferguson alleges that the union breached its duty of fair representation when it failed to thoroughly investigate her accident, failed to contact witnesses to the accident, and failed to request arbitration of the grievance protesting her discharge in a timely fashion. Am. Compl. ¶¶ 12, 19. To find that a union's representation was perfunctory requires "evidence that the union acted with reckless disregard for the employee's rights." Gwin v. Nat'l Marine Eng'rs Beneficial Ass'n, 966 F. Supp. 4, 8 (D.D.C. 1997) (citing Castelli v. Douglas Aircraft Co., 752 F.2d 1480, 1482 (9th Cir.1985)). "A union's duty does require some 'minimal investigation' of an employee's grievance . . . but the quantum that will be considered 'minimal' is quite small." Gwin, 966 F.

8

Supp. at 8; see Castelli, 752 F.2d at 1483 (finding no DFR breach when the union representative "spent no more than one and a half hours in investigation and preparation for the arbitration, and did not call key witnesses"). Here, it is undisputed that union representatives met with Ferguson multiple times, presented her case with her for "about an hour" before the accident review board, and appealed her grievance through Step 4 of the process. The facts, then, do not support plaintiff's claim that the union processed her grievance in a "perfunctory fashion."

Although a union's actions are accorded substantial deference, courts have "attempted to formulate some standards for determining when a union's conduct rises to the level of arbitrariness." See Watkins, 736 F. Supp. at 1160-61. "[A]n act of omission by a union may be so egregious and unfair as to be arbitrary." Id. (quoting Galindo v. Stoody, 793 F.2d 1502, 1514 (9th Cir. 1986)). "The crucial elements for a claim of arbitrariness are that the union's error involved a ministerial rather than judgmental act, that there was no rational or proper basis for the union's conduct, and that the union's conduct prejudiced a strong interest of the employee." Watkins, 736 F. Supp. at 1161. Timeliness is a ministerial duty, and courts have found a breach of the duty of fair representation when a union fails to meet a mandatory deadline. Dutrisac v. Caterpillar Tractor Co., 749 F.2d 1270, 1273-74 (9th Cir. 1983) (citing cases) ("Keeping track of deadlines is a mechanical function that depends on establishing a tickler system and diligence in using it, not on special training.").

In Watkins, the union failed to set up a necessary "first-step grievance hearing within thirty days of filing the grievance." Watkins, 736 F. Supp. at 1161. The union moved for summary judgment, asserting that plaintiff alleged "nothing more than negligence" which "is insufficient to support a [DFR] claim." Id. at 1160. The court denied the union's motion, ruling that summary judgment was inappropriate when the union failed to "present plaintiff's grievance

on time," which prejudiced "plaintiff's interests in having his grievance heard." Id. Local 689, like the union in Watkins, asserts that its conduct was merely "negligent correspondence." Defendant's Motion in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp'n") [Docket Entry 67] at 6. However, missing the deadline is a ministerial duty, which a reasonable jury could find prevented Ferguson from having a final opportunity to "hav[e] her grievance heard" without a "rational or proper basis." Watkins, 736 F. Supp. at 1161. Alternatively, a reasonable jury could find that the union's missed deadline during a hectic election time period, after representing Ferguson before the accident review board and four steps of the grievance procedures, was "mere negligence" that does not support a DFR claim. There is, quite simply, a genuine dispute as to that issue. Hence, summary judgment is not appropriate for either Local 689 or Ferguson on the DFR claim. However, in a hybrid action, Local 689 may still prevail on summary judgment upon showing that WMATA did not breach the CBA when it discharged Ferguson. See Delcostello, 463 U.S. at 165.

2. WMATA Did Not Violate the CBA

"Whether the undisputed facts in a specific case establish -- or fail to establish -- proper cause for discharge within the contemplation of a given CBA is a question of law (and, thus, a question for the court)." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 22 (1st Cir. 2003) (citing Crider v. Spectrulite Consortium, 130 F.3d 1238, 1242 (7th Cir. 1997)). "When courts interpret CBAs, traditional rules of contract interpretation apply as long as they are consistent with federal labor policies." Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp., 230 F.3d 569, 576 (2d Cir. 2000) (citing Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Constr. Co., 932 F.2d 1443, 1448 (11th Cir.1991)). "Interpretation of a contract [] must begin with the

plain meaning of the language." Am. Fed'n of Gov't Emps. v. Fed. Labor Relations Auth., 470 F.3d 375, 381 (D.C. Cir. 2006). Unambiguous provisions in the agreement must be given effect as written. Ameren Servs. Co. v. FERC, 330 F.3d 494, 498 (D.C. Cir. 2003) ("[W]e first consider de novo whether the . . . agreement unambiguously addresses the matter at issue. If so, the language of the agreement controls for we must give effect to the unambiguously expressed intent of the parties.") (internal citation and quotation marks omitted); Wash. Metro. Area Transit Auth. v. Georgetown Univ., 347 F.3d 941, 946 (D.C. Cir. 2003) ("If the ... language is unambiguous, the court need only apply the meaning of the words. If the language is ambiguous, the court must determine the parties' intent ... in light of the circumstances surrounding [the agreement's] execution."). Only when provisions are ambiguous may courts turn to extrinsic evidence -- such as bargaining history, past practices, and other provisions in the CBA -- to interpret the language in question. See Am. Fed'n of Gov't Emps, 230 F.3d at 383.

Section 104(d) of the CBA negotiated by WMATA and Local 689 requires that WMATA have "sufficient cause" to "discharge[], suspend[], or otherwise discipline[]" a covered employee. Agreement between WMATA and Local Union 689, Defendants' Motion for Summary Judgment, Exhibit I ("CBA") at 2. WMATA's Accident Policy "outline[s] minimum standard actions to be administered when an employee is involved in an accident." Accident Policy at 79. Under the Accident Policy, the minimum disciplinary action for an employee's first "major" "preventable" accident within the last 365 days is "written warning, 3 days suspension, and 1 day of paid training." Id. After three "major" "preventable" accidents, the minimum disciplinary action is dismissal. Id. However, the policy "does not restrict a Superintendent from taking more severe action based on specific circumstances surrounding an individual accident, with the approval of the General Superintendent." Id. at 80.

The parties interpret this policy differently as applied to Ferguson's discharge. Ferguson asserts that, because WMATA did not "thoroughly investigate" the accident scene or identify "specific circumstances" that warranted more than the minimum action under the Accident Policy, WMATA violated the "sufficient cause" provision of the CBA when she was discharged. Pl.'s Mot. at 3. On the other hand, Local 689 asserts that "WMATA was entitled to administer discharge to the operator who had a preventable collision with a pedestrian resulting in death." Defendant's Motion for Summary Judgment ("Def.'s Mot.") at 16. The union argues that WMATA's "more severe action" of discharge was permitted due to the severity of Ferguson's accident that "was preventable by a professional bus operator." Id. at 16-17.[1]

Prior to June 8, 2006, Ferguson was not involved in any accidents while performing her duties as a bus operator at WMATA. Pl.'s Statement ¶ 3. Ferguson alleges that discharge was "too harsh" a disciplinary action under the CBA for the June 8, 2006 accident given her otherwise clean record. See Ferguson Grievance. She relies on (1) WMATA's failure to "thoroughly investigate" the accident and incorporate facts from the Metropolitan Police Report into its conclusion that Ferguson violated operating rules and (2) an arbitration decision relating to another bus driver involved in an accident initially classified as "major" and "preventable," who was held not to have been properly discharged under the CBA. Pl.'s Mot. at 2. The Court will address each argument in turn.

The Accident Policy permits disciplinary action once accidents "have been thoroughly investigated and rated preventable based on the Metrobus Standard Operating Procedures and the Guide to Determining the Preventability of Accidents." Accident Policy at 80. Ferguson argues

---

[1] Having earlier been dismissed from this action, WMATA is not a participant in this assessment.

that Superintendent Ballard did not "thoroughly investigate" the accident because he did not visit the scene of the accident or interview witnesses other than herself and two Metropolitan police officers who witnessed the accident. See Pl.'s Mot. at 2; Pl.'s Statement ¶ 17. Additionally, Ferguson emphasizes that Ballard failed to "take into account" the findings of the Police Report that indicated the pedestrian had committed a violation by entering the crosswalk after the "walk" sign had transitioned to a flashing "don't walk" sign. See Pl.'s Mot. at 2; Investigative Report; Investigative Supplemental Report.

Ballard's investigation was sufficient under WMATA's Accident Policy. He interviewed Ferguson and two police officers who were witnesses to the accident. See Accident Report. The parties do not dispute that Ferguson's bus hit a pedestrian walking in a crosswalk, whom she did not see, when making a right turn on a green light. Pl.'s Statement ¶¶ 7, 8, 13. Further investigation by WMATA would not have changed these facts. A WMATA bus driver must "do everything expected of a trained[] professional to avoid involvement in an accident." Accident Policy at 79. This standard of care far exceeds whether a bus driver will be held criminally liable for an accident, which was the focus of the police investigation. For example, WMATA's Standard Operating Procedures for "Defensive Driving" include observing "all directions before moving [the] bus. Proceed only when certain that pedestrians will stay clear of the bus." WMATA Metrobus Standard Operating Procedures [Docket Entry 60-11] at 44. The Standard Operating Procedures for "Right Turns" require bus operators to "observe left and left front for approaching vehicles or pedestrians in the crosswalks" and to "use right side and interior mirrors to check clearance from curb, fixed objects and pedestrians." Id. at 16. Police reports may provide helpful insight into an accident scene, but the Accident Policy states that WMATA must evaluate the accident based on WMATA's Standard Operating Procedures and its Guide to

Determining the Preventability of Accidents, not on the standards for criminal liability. Accident Policy at 79. Based on the undisputed facts, WMATA concluded that Ferguson violated a number of WMATA's Standard Operating Procedures because she "failed to make the proper observations while turning" and "failed to enter the crosswalk with caution." Accident Report at 3. Professional bus drivers are held to a higher safety standard to avoid accidents precisely because pedestrians do not always follow traffic rules.

Next, Ferguson relies on another arbitration decision to demonstrate how WMATA lacked "sufficient cause" to discharge her. The Arbitration Board in that case evaluated whether an accident between a WMATA bus and a taxi cab -- that resulted in the death of a taxi passenger -- had been properly classified as "major" and "preventable." Arbitration Decision of Ronald Taylor [Docket Entry 65] at 1-2. That bus operator had not previously presented his case before the accident review board. See id. WMATA's investigation relied on one witness to the accident -- who claimed that he saw the bus run a red light -- who the Board found unreliable due to a series of contradictory statements about the accident scene. Id. at 28, 31. Thus, the Arbitration Board ruled that WMATA had failed to prove that the bus operator could have prevented the accident. Id. Under the Accident Policy, discharge is only permitted if the accident is classified as both "major" and "preventable"; thus, WMATA had violated the CBA by discharging Taylor without "sufficient cause." See id. at 34. In contrast, here Ferguson had already appealed the classification of her decision to the accident review board, which upheld Ballard's decision that she was responsible for a "major" "preventable" accident. See Accident Appeal. The accident review board decision is binding as to the classification of the accident. See Accident Policy at 3. Hence, if Ferguson's appeal to the Arbitration Board had been timely,

14

the Board could only have reviewed "the degree of discipline imposed on Ms. Ferguson." Ferguson Arbitration at 3.

Nonetheless, Ferguson claims WMATA violated the "sufficient cause" provision of the CBA because discharge was "too harsh" a disciplinary action under the Accident Policy. The Court disagrees. Under the plain language of the agreement, WMATA has "sufficient cause" to discharge an employee who has participated in a "major" "preventable" accident "based on specific circumstances surrounding an individual accident." Accident Policy at 2. Thus, because the Court, like the Arbitration Board, is bound by the accident review board's classification of the accident, the Court may evaluate only whether WMATA properly based its decision to discharge Ferguson on "specific circumstances surrounding [her] individual accident." See id. This language does not place a heavy burden on WMATA -- to comply with the plain language of the Accident Policy, WMATA must simply explain why the "specific circumstances" of Ferguson's accident warranted discharge. Here, Ferguson's accident was classified "major" and "preventable," resulted in the death of a pedestrian, and WMATA identified a number of specific violations as the basis for Ferguson's discharge:

> Based on all available information, the Operator's report, the Street Supervisor's report and the Guide to Determining Preventable Accidents, the accident rated Preventable Major. Operator failed to follow Standard Operating Procedure #5 Right Turn, #8 Intersection Operation, #12 Observation, and #13 Defensive Driving. Operator is primarily responsible for this accident, her actions were clearly negligent, and reckless. Operator showed disregard for principles of bus safety. Operator failed to make the proper observations while turning. She further failed to enter the crosswalk with caution. The pedestrian was in the crosswalk when she was struck with the front bumper of the bus. Operator had multiple violations of Standard Operating Procedures.

Accident Report at 3. Hence, WMATA based its decision to discharge Ferguson on "specific circumstances surrounding [the] individual accident" and thereby had "sufficient cause" under the CBA to discharge Ferguson. Because WMATA did not breach the CBA when it discharged

Ferguson, the Court must grant summary judgment for Local 689.

## II.     Count II - Intentional Infliction of Emotional Distress (IIED)

To assert a claim for IIED, a plaintiff must show "'(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'" <u>Minch v. Dist. of Columbia</u>, 952 A.2d 929, 940 (D.C. 2008) (quoting <u>Dist. of Columbia v. Thompson</u>, 570 A.2d 277, 289-90 (D.C. 1990)). "The concept of 'outrageousness' is central to the tort," and "[l]iability will not be imposed for 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" <u>Homan v. Goyal</u>, 711 A.2d 812, 818 (D.C. 1998) (citations omitted). Rather, "[l]iability will be imposed only for conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" <u>Id.</u> (quoting <u>Drejza v. Vaccaro</u>, 650 A.2d 1308, 1312 n.10 (D.C. 1994)).

"[T]he requirement of outrageousness is not an easy one to meet." <u>Drejza</u>, 650 A.2d at 1312. Here, Ferguson contends that Local 689's conduct in failing to investigate the accident and in processing her wrongful discharge grievance in a "perfunctory manner" constitutes "extreme and outrageous" conduct. Plaintiff's Renewed Motion for Summary Judgment ("Pl.'s Mot.") at 8. Again, the Court disagrees. Local 689's untimely processing of Ferguson's grievance at the arbitration stage was negligent, but this failure -- after pursuing her grievance through the first four steps -- does not come close to "extreme and outrageous" behavior. Indeed, Ferguson even conceded that leadership from Local 689 were "sympathetic" to her case and "thought it ought to go forward." Ferguson Dep. 154:23-24; 155:1.

Moreover, to sustain a claim for IIED, a plaintiff must demonstrate that "the defendant's actions [] proximately cause[d] the plaintiff emotional distress 'of so acute a nature that harmful

16

physical consequences might be not unlikely to result.'" Kotsch v. Dist. of Columbia, 924 A.2d 1040, 1046 (D.C. 2007) (quoting Clark v. Assoc. Retail Credit Men of Wash., D.C., 105 F.2d 62, 65 (D.C. Cir.1939)).  Ferguson has endured emotional distress following the tragic accident on June 8, 2006.  But the undisputed facts do not support that Local 689's conduct was "outrageous" or caused this distress.  Hence, the Court will grant Local 689's motion for summary judgment on the IIED claim as well.

## CONCLUSION

For the reasons explained above, the Court will grant Local 689's motion for summary judgment and deny Ferguson's motion for summary judgment  A separate Order accompanies this Memorandum Opinion.

/s/
JOHN D. BATES
United States District Judge

Dated:   December 21, 2010